Filed 12/23/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.G., a Person Coming Under the Juvenile Court Law. | B344654 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 21CCJP03266A) |
| Plaintiff and Respondent, | |
| v. | |
| M.A. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge. Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant Father.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

We hold the Los Angeles County Department of Children and Family Services adequately discharged its duty of reasonable inquiry under California's analogue to the Indian Child Welfare Act, known as ICWA, by asking people it would contact in its usual course of business whether the child might have Native American heritage. We reaffirm *In re H.B.* (2023) 92 Cal.App.5th 711, 718–721 (*H.B.*) As *H.B.* held, ICWA does not impose an independent duty to go further afield. (*Ibid.*) We respectfully disagree with *In re Claudia R.* (2025) 115 Cal.App.5th 76, 86 (*Claudia*), which rejected *H.B.* and placed additional burdens on the Department.

The burden imposed by ICWA's duty of inquiry is slight. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1143 (*Dezi*).) This accords with legislative intent. The Department's resources are limited. Effort chasing down leads about Indian heritage will eat up time otherwise devoted to caring for children in need. It will delay children's cases when formative years are fleeting. The Legislature did not want to impose those costs on the most vulnerable in our community. (See *In re S.S.* (2023) 90 Cal.App.5th 694, 702–705 (*S.S.*).)

I

In 2021, Mother and Father were both 19 years old. Their son was born in November 2020. Father is a registered sex offender. Mother suffered from untreated bipolar disorder. The Department proceeded on the son's behalf because of his parents' domestic violence, Father's criminal history, and Mother's untreated mental illness. The court removed the son from the parents and ordered reunification services. These efforts extended into 2023, but Mother was inconsistent and Father was

noncompliant. The court terminated family reunification services, terminated parental rights, and set adoption as the permanent plan for the son. During this time the Department placed the son with Ms. J. These facts are uncontested.

The court found no reason to believe ICWA applied to the son.

In 2021, Mother and Father denied Native American heritage. Mother filed a form to that effect and said she did not believe Father had such ancestry. Father filed an unsigned form denying Native American heritage that year. In December 2022, the court ordered the Department to "interview/attempt to interview all extended family members about whether there is any American Indian ancestry in the family."

The following people denied, or said they had no information about whether, the son had Native American heritage:

1. Mother,
2. Father,
3. Mother's friend Mike,
4. the maternal grandfather,
5. the maternal grandmother,
6. the paternal step-grandmother,
7. the paternal great-grandmother,
8. a maternal uncle,
9. a maternal aunt,
10. a different maternal aunt,
11. a maternal cousin,
12. a paternal aunt, and
13. a paternal great-uncle.

In January 2023, Father told Department workers he might have Native American ancestry and they should contact the son's paternal grandparents and paternal great-grandmother. The Department contacted paternal step-grandmother Stephanie A., who said she was unaware of any Native American ancestry. Paternal great-grandmother Lucila A. also denied Native American heritage and said no family members were registered with a tribe.

There also was contact with (1) maternal grandfather Robert G., who stated he had not heard of any Native American heritage in the family; (2) maternal uncle Robert G. Jr., who had "no clue" whether the family had Native American heritage and no contact information for additional relatives; (3) maternal cousin Dedra M., who did not believe the family had Native American heritage; and (4) maternal grandmother Erica M., who denied Native American ancestry for herself, Mother, and child, and told the Department there were no other relatives they could contact. Department workers spoke to Mother's family friend Mike, who said he was not aware of any Native American heritage for Mother's family. The Department tried to contact maternal great aunt, Yolanda M., but the phone number had been disconnected. Having reviewed the Department's efforts, in February 2023, the court ruled it had no reason to know ICWA applied to the son.

In September 2023, Father reversed field and denied having Native American heritage. He told the Department neither he nor his family had registered with a tribe or identified as Native American.

Mother again denied Native American ancestry. Maternal cousin Dedra J. also denied any Indian ancestry.

4

The following month, the Department left voicemails requesting callbacks from paternal aunt Alizaemarie A., paternal grandfather Michael A., paternal grandmother Laura R., paternal great-uncle Paul A., and maternal great-aunt Yolanda M. A social worker spoke to maternal grandfather Robert G., who again denied Native American heritage and relayed that his family had not registered with any tribe. The Department also contacted maternal aunt Cecilia V., who was unaware of Native American ancestry, and maternal aunt Natalie R., who denied any such ancestry and said her family has not registered with a tribe.

Over the next two months, the Department spoke to paternal aunt Alizaemarie A., who said her family may have Native American ancestry through her "Nana Debbie," she and Father had not registered with any tribes, and the Department should follow up with paternal grandparents. Paternal great-uncle Paul A. said his "grandmother maybe was, but I'm not sure what tribe or where she was born," and the family had not registered or associated with a tribe. He had no contact information for other relatives.

In January 2024, the Department spoke to a woman it thought might be paternal grandmother Laura R., but she claimed she had no relation to the family. The Department also left another voicemail for paternal grandfather. Mother and Father again denied Indian ancestry in April 2024. In October 2024, Mother again denied Indian ancestry, and the Department left another voicemail for paternal grandfather.

In January 2025, the Department left voicemails for maternal great-aunt Yolanda M., paternal grandfather Michael A., paternal step-grandmother Stephanie A., paternal great-

5

grandmother Lucila A., paternal aunt Alizaemarie A., and paternal great uncle Paul A. The Department again spoke to a woman it believed was paternal grandmother Laura R. at the same number as before, but this time she said that she, Father, and her family had no Native American ancestry.

The parents appeal on the ground of ICWA only.  They claim the Department did not speak to four known relatives:

- the maternal great-grandfather,
- a paternal great-aunt,
- paternal cousin Lorena G., and
- maternal aunt Bella G.

## II

Our Supreme Court repeatedly has explained the basics of ICWA.  (See *In re Ja.O.* (2025) 18 Cal.5th 271, 276–278, 280–291; *Dezi, supra,* 16 Cal.5th at pp. 1128–1134; see also *S.S., supra*, 90 Cal.App.5th at pp. 696–703.)

We review the juvenile court's finding regarding the adequacy of the inquiry and ICWA's applicability with deference. (*Dezi, supra,* 16 Cal.5th at pp. 1140–1141, 1144.)  The juvenile court's fact-specific determination is a quintessentially discretionary function.  On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent.  (*Id.* at p. 1141.)

As stated, the parents' appeal focuses on four people:

- the maternal great-grandfather,
- a paternal great-aunt,
- paternal cousin Lorena G., and
- maternal aunt Bella G.

The juvenile court was fully justified in deciding that, on this record, the Department had done enough without consulting

these four.  This record shows the usual course of the Department's work had *not* required that it speak to these four people.  It *had* consulted a considerable number of others, and it had raised ICWA concerns with everyone it consulted.

This investigation was reasonably thorough.  It is not mandatory for the Department always to "inquire of everyone who has an interest in the child." (*Dezi, supra,* 16 Cal.5th at p. 1141.)  The law of diminishing returns is at work.  "The juvenile court has discretion to determine when enough is enough." (*H.B., supra*, 92 Cal.App.5th at p. 721.)

The Department's ICWA duty must remain reasonably confined because the Legislature did not want this additional duty of inquiry to detract from the Department's service to children in desperate need.  (See *S.S., supra*, 90 Cal.App.5th at pp. 702–705.)

We respect but disagree with our colleagues in Division Seven, whose *Claudia* opinion would impose additional duties on the Department.  Legislative intent is contrary to the *Claudia* holding.  (See *S.S., supra*, 90 Cal.App.5th at pp. 702–705.)

The *Claudia* analysis reasoned that the effort to contact a relative for whom the Department had contact information would be minimal.  (*Claudia, supra,* 115 Cal.App.5th 76 at p. 87.)

We disagree with this assessment of costs and benefits.  Suppose you have someone's phone number.  How much work is it to ask that person a question?  That depends on whether the number is still valid, whether the person answers, whether you can leave a message, whether the person responds to your message, whether you can pick up immediately if they do respond, whether you need an interpreter, and so forth.  Multiply this potential for time-consuming telephone tag by the number of

7

potential relatives in a given case and by the number of children under supervision in a county of ten million people.  We are not confident the total effort always will be "a rather simple task." (*Dezi, supra*, 16 Cal.5th at p. 1143.)

This potentially wasted effort could be put to productive ends by devoting it to the Department's usual work of serving children and families.  The Legislature intended that the additional ICWA inquiry would not result in a workload increase for county caseworkers.  (*S.S., supra,* 90 Cal.App.5th at p. 703.) We apply that rule here and defer to the juvenile court's exercise of its discretion.

**DISPOSITION**

We affirm.


WILEY, Acting P.J.

I concur:



VIRAMONTES, J.

8

**UZCATEGUI J., Dissenting.**

Marie G. (mother) and Michael A. (father) contend that the Department of Children and Family Services (DCFS) failed to conduct an adequate inquiry into King's Indian ancestry, as the Indian Child Welfare Act (ICWA) requires. Specifically, parents claim DCFS's failure to contact several of King's known extended family members rendered its ICWA inquiry inadequate. I agree. While DCFS conducted a thorough ICWA investigation into many of mother's and father's family members, it overlooked several known relatives. Because DCFS did not "interview all reasonably available extended family members," I would conditionally reverse the juvenile court's order terminating parental rights and remand for ICWA compliance. (*In re Claudia R.* (2025) 115 Cal.App.5th 76, 81 (*Claudia*).)

DCFS has an "affirmative and continuing duty to inquire whether" a child in dependency proceedings "is or may be an Indian child." (Welf. & Inst. Code, § 224.2, subd. (a); accord, *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11–12.) This includes an initial duty to ask extended family members, among others, if they have "any information that the child may be an Indian child." (Welf. & Inst. Code, § 224.2, subd. (b)(1).) " 'Extended family member' " means the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (Welf. & Inst. Code, § 224.1, subd. (c)(1); see also 25 U.S.C. § 1903(2).)

Unlike my colleagues in the majority, I agree with the analysis of *In re Claudia R*, where Division 7 recently addressed this very issue: "This appeal raises the question whether a child welfare agency has a duty under section 224.2, subdivision (b), to

9

interview all reasonably available extended family members who may have knowledge of a child's Indian ancestry. It does." (*Claudia*, *supra,* 115 Cal.App.5th at p.81.)

Parents have identified two "extended family members" that both meet the required statutory definition and were available to DCFS. The first was child's maternal aunt, Bella G. While mother had an antagonistic relationship with Bella G., the record indicates that maternal grandmother was in contact with her. DCFS did not inquire of her. The second was paternal cousin Lorena G. Despite the fact that DCFS had a phone number for Lorena G. and the court ordered DCFS to evaluate Lorena G. for placement of the minor in 2021, DCFS apparently made no inquiry of Lorena G. "[W]here, as here, the [family member] is readily available, section 224.2, subdivision (b)(2), requires an inquiry into the child's Indian ancestry." (*Claudia*, *supra,* 115 Cal.App.5th at p. 90, fn. 6.)

For these reasons, I respectfully dissent.

UZCATEGUI, J. *

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10